AUG 27 2021 PM 12:57
FILED - USDC - BPT - CT

STATE OF CONNECTICUT      :

                           :

                           :       ss: Bridgeport, Connecticut

                           :

COUNTY OF FAIRFIELD      :       August 27, 2021

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Jonathan Lauria, being duly sworn, depose and state as follows:

## BACKGROUND OF AFFIANT

1. I submit this affidavit in support of a criminal complaint and arrest warrant for **Anatoly Braylovsky** for endeavoring to obstruct the due administration of justice, in violation of 18 U.S.C. §1503(a) (the "**Target Offense**").

2. I am a regularly appointed Special Agent of the Federal Bureau of Investigation and have been since 2005. I have previously served in the San Francisco and Buffalo Field Offices.   My current assignment is to the New Haven Field Office, Safe Streets Task Force.   Throughout my employment as a Special Agent, I have investigated various federal and local violations related to organized crime, drug trafficking, murders for hire, firearms violations, money laundering, and wire fraud resulting in numerous federal and local convictions.   I have conducted countless hours of physical surveillance as well as coordinated electronic surveillance for confidential human sources and undercover employees. I have debriefed witnesses, confidential human sources, and other law enforcement officers related to these investigations. I have participated in numerous Title III wiretap investigations and served numerous search and arrest warrants at the federal, state, and local levels.

3. The facts contained in this affidavit come from my training, experience, and participation in this investigation, in addition to the participation of the other law enforcement officers involved. This affidavit does not set forth every fact related to this investigation but merely those facts needed to outline sufficient probable cause for the requested warrant.

1

**PROBABLE CAUSE**

4.   **Braylovsky** is currently on pretrial release in a criminal case pending in the District of

Connecticut. His pending case began on May 29, 2020, when the Honorable Robert M. Spector,

U.S.M.J. issued an arrest warrant and criminal complaint charging **Braylovsky** with violations of

the following statutes:

- 21 U.S.C. § 841 (Possession with intent to distribute and distribution of a controlled substance)

- 21 U.S.C. § 846 (Conspiracy to possess with intent to distribute and to distribute a controlled substance)

- 18 U.S.C. § 1347 (Health care fraud)

- 18 U.S.C. § (False statements relating to health care matters)

5.   I am not personally familiar with the facts of **Braylovsky's** case because I was not part of

the investigative/prosecution team. However, the complaint affidavit (Case No. 20-cr-94 (KAD))

details that **Braylovsky** was a practicing physician prior to his arrest. According to the complaint

affidavit, during the investigation, law enforcement used a confidential source (the "CS") to

record patient encounters with **Braylovsky**. During these recorded patient encounters,

**Braylovsky** gave the CS oxycodone prescriptions in exchange for $1,600 in government funds

without performing a medical exam. The CS also recorded conversations he/she had with

**Braylovskyin** in which **Braylovsky** made incriminating statements.

6.   On June 4, 2020, law enforcement arrested **Braylovsky**, and he was presented in this

Court that same day.

7.   On June 17, 2020, a federal grand jury in New Haven returned a five-count indictment

charging **Braylovsky** with violations of:

- 21 U.S.C. § 846 (Conspiracy to possess with intent to distribute and to distribute oxycodone)

- 21 U.S.C. § 841 (Possession with intent to distribute and distribution of oxycodone)

- 18 U.S.C. § 1347(Health care fraud)

8.  Jury selection in **Braylovsky's** case is currently scheduled for October 5, 2021.

9.  On or about August 18, 2021, a former employee of the FBI contacted a current FBI Special Agent to report that a concerned citizen ("CC1") told him that **Braylovsky** came to see CC1 at CC1's place of business looking for help regarding witnesses associated with **Braylovsky's** current case.

10. On or about August 19, 2021, members of the DEA, HHS, and FBI who were part of the investigative team in **Braylovsky's** pending criminal case interviewed CC1 to determine whether the information he gave to the former FBI employee was credible.[1] CC1 told investigators, in substance, that **Braylovsky** said the five days he spent in the New Haven jail were the worst five days of his life and he did not want to go back to jail. **Braylovsky** asked if CC1 would talk to his/her "brother," who **Braylovsky** believed is the president of the Hell's Angels. **Braylovsky** further explained there are witnesses who will testify against him. **Braylovsky** specifically referenced "a guy who was mic'd up" that would testify against him and said "this guy's gotta go." CC1 understood this as **Braylovsky** asking CC1 to help him find someone to intimidate or kill this witness. CC1 advised **Braylovsky** that CC1 needed to think and told **Braylovsky** to return to CC1's place of business on Tuesday, August 24, 2021, between 11:00 a.m and 1:00 p.m. **Braylovsky** thanked CC1 and left the location.

11. Investigators deemed CC1's information to be credible and that it warranted further investigation. At that point, an investigative team separate from the team that investigated

---

[1] CC1 is not receiving any monetary compensation or consideration in exchange for his/her information. CC1 has prior criminal convictions for failure to file tax returns and breach of peace.

**Braylovsky's** underlying charges and led by the FBI was established to investigate

**Braylovsky's** conduct.

12. The FBI developed a plan to corroborate CC1's information by placing an FBI

Undercover Employee (UCE) inside CC1's place of business on August 24, 2021, between 11:00

a.m. and 1:00 p.m. to meet **Braylovsky** should he return as CC1 directed.

13. On August 24, 2021, at approximately 10:30 a.m., **Braylovsky** arrived at CC1's place of

business and met with CC1's spouse ("CC2").[2] Following this meeting, CC2 reported to the FBI

that **Braylovsky** showed up and asked for CC1, stating that CC1 and **Braylovsky** arranged to

meet "today." CC2 said his/her minor child initially encountered **Braylovksy**, and that the minor

child told **Braylovsky** that CC1 would be back at 11. Then, CC2 encountered **Braylovsky** and

told him that CC1 was out of the country. **Braylovsky** cited the discrepancy between the

information he was told by the minor child and CC2. CC2 told **Braylovsky** that CC2 did not

want anyone to know CC1 was out of the county. **Braylovsky** then left the place of business.

14. Later that day, the UCE called **Braylovsky** at a phone number believed to be associated

with his residence and spoke to **Braylovsky** in a recorded conversation.[3] During the recorded

conversation, a male answered the phone "Hello."   The UCE replied, "Toly," short for Anatoly,

to which the male replied "Yes." The UCE explained to **Braylovsky** that CC1 told the UCE that

the UCE and **Braylovsky** were supposed to meet between "11 and 1." **Braylovsky** stated "that's

not what [he/she] told me." Later in the conversation, **Braylovsky** stated, "I went over there, and

they told me [he/she] went to [another country]." The UCE stated he/she was only in town for a

short time and if **Bralovsky** wanted to meet, he could meet the UCE at a nearby Home Depot.

---

[2] CC2 is not receiving any monetary compensation or consideration in exchange for his/her
information. CC2 does not have any criminal convictions.
[3] A copy of the recorded conversation will be made available for the Court's review prior to
signing this affidavit.

**Braylovsky** asked the UCE, "Can you give me 15 minutes?" to which the UCE agreed, and the call ended shortly thereafter.

15. The UCE and FBI surveillance team members then went to the Home Deport parking lot and awaited **Braylovsky's** arrival. The UCE was equipped with audio/video recording devices.

16. At approximately 12:30 p.m., on August 24, 2021, **Braylovsky** arrived in the Home Deport parking lot driving a Dodge pickup truck. **Braylovsk**y circled the parking lot more than once. There was a dog in the truck. After a brief introduction, **Braylovsky** entered the UCE's vehicle.[4]

17. The UCE told **Braylovsky** "So [CC1] reached out through a mutual friend, alright. Said you had a problem, I drove up here, what can I help you with? **Braylovsky** responded "[CC1] never told me anything about any meeting." UCE responded "okay." **Braylovsky** then said "So, I'm a little bit, you know, and you called me at my house." Later, **Braylovsky** told the UCE "So, im just, you know, in a fucked up place." The UCE said "Alright," and **Braylovsky** responded "and it's hard for me to trust anybody. So, how do I know this isn't [U/I]"

18. The UCE told **Braylovsky** "Alright. How do you know [CC1]? I don't know [CC1]. Do you trust [CC1]? Because I trust my friends and my friends trust [CC1]." **Braylovsky** responded "Yes I know [CC1] and I was supposed to meet with him this morning and get some feedback [U/I] and all of a sudden I get a phone call from you" and later says "So I am a little skeptical." The UCE told **Braylovsky** "Well, understand this is what I do. I am a professional, alright? And if I need to find somebody, I find them, okay? Now, my mutual friend said I was going to meet somebody there between 11 and 1. I went there at 11 and I waited." **Braylovsky said "Í** was there. I was there." The UCE responded "I was told you came early and then left." **Braylovsky**

---

[4] A copy of the recorded conversation will be made available for the Court's review prior to signing this affidavit.

asked "Who told you that?" The UCE told him "[CC1] reached out.   I think [his/her spouse]

works for [U/I] or something like that? Okay, alright?   See the big circle? Now I understand, I

don't trust nobody either. That's why you asking where I'm from, I'm not going to tell you

where I'm from. I'm not going to tell you my name, I'm not going to tell you anything about me.

Matter of fact when this meeting is done, this truck is gone, everything else is gone. The phone I

contact you on gets burned. Alright? Because not only do you have to have trust in certain

individuals you have to know to protect yourself." **Braylovsky** said **"**I understand."

19. Later in the conversation, the **Braylovsky** asked the UCE "Give me a number I can reach

out to you?" and the UCE said "You got a number where you can reach out to me." **Braylovsky**

asked "The number you called me on?" and the UCE responded "Yeah. Okay. So why am I

here? **Braylovsky** responded "They-they told you why you're here." The UCE said "I

understand that. Okay. Who am I looking for? **Braylovsky** responded "[U/I] this was out of the

blue." The UCE then told **Braylovsky** "So when we find this person and you decide what it is

you want to do. How long do I have to wait around here? I'm only here for a short period of

time. I've got other people I've got to go meet and talk to." **Braylovsky** said "Okay that's fine."

**Braylovsky** asked "Can I use that number anytime? The UCE responded No-no it will probably

be, that number will probably be dead here in a day or two." **Braylovsky** responded "Alright."

And the UCE said "But you reached out to [CC1] and [CC1] reached out to us alright? We're

here now." **Braylovsky** told the UCE "I understand what you're saying but I-have to uh, I have

to talk to [CC1] this is what happened. You got to understand you know?" The UCE told

**Braylovsky** "This is costing me time and money." **Braylovsky** responded "Understand that this

is costing me my life."

20. The UCE told **Braylovsky** ". . . I don't know about your situation, I don't know what's

going on with you. I don't want to know. Alright? I don't want to hear whatever your issue is"

and that "I know why I'm here and I know what my job is alright? So, is this something that uh you're having second thoughts on? What-what's the deal? **Braylovsky** responded "Yes" and the UCE said "My guys are committed, you know when I get the phone call, people I go talk to are committed. This is why-this is why I'm here. Alright? So I don't like coming up here" and **Braylovksy** interjected "No, no I totally understand." Then **Braylovsky** said "And Im not trying to um step over your toes you know, or to bring you here for no good reason. It's just this-this is out of the blue for me. I was not expecting this. I thought this was - " and the UCE interjected "this must have been a misunderstanding then." **Braylovsky** responded "Maybe, I thought this was a done deal. When he didn't talk to me or anything like that." The UCE replied "What do you mean a done deal, like he going to take care of it?" **Braylovsky** responded "no no no – If he didn't reach out to me, there there's nothing there's no connections or nothing like that. So I uh, so anyway, so-" Here, I believe **Braylovsky** was saying that since CC1 was not at his/her place of business earlier that day, that **Braylovsky** believed CC1 would be unable to assist him.

21. The UCE asked **"You want to think about it? What do you want to do?" Braylovsky** interjected "I need, I need time to think about it." and the UCE said "I'll be in town here for at least till' tomorrow." **Braylovsky** responded "I need, I need to confirm this with [CC1]." The UCE said "Okay" **Braylovsky** said "and his [spouse] told me he's in [another country], which I don't really believe, I don't know." The UCE said "Okay." Later, **Braylovksy** "I'm just skeptical." Here, based on my training and experience, I believe that **Braylovsky** was telling the UCE that he did not want to move forward with anything until he speaks to CC1 and that he was skeptical about meeting with an unknown person regarding his plans.

22. The UCE told **Braylovsky** "Okay, whatever your situation is I don't want to know alright?   I don't know if this is an ex-girlfriend, ex-wife, I have no idea. I'm not concerned with that. I take a job, I take, I fix it and I move on. Alright? People I work for are not going to be

7

appreciative of [CC1] bringing me down here. For somebody that's not sure what they want to do. Alright?" **Braylovsky** replied "it's not that I'm not sure what I [U/I] wanna do, it's just, this was, I wasn't expecting this." The UCE asked "You weren't prepared that's what you're saying?" and **Braylovsky** said "Yes. Because" The UCE then asked **Braylovsky** "So what do you need to be prepared? What do you need-what is it that you want – what is it that you reached out to CC1 for? **Braylovsky** responded "I'm not saying anything at this time." The UCE then told **Braylovsky** ""Alright. Okay. Alright well you got my number. You could reach back out to me. Alright, you call [CC1], do whatever the fuck you got to do. Square that shit away. I'm here for another day that's it I'm moving on. You're going to miss your opportunity. Okay? Fair enough?" **Braylovsky** asked "We will not be able to reconnect after that?" and the UCE responded "Maybe [CC1] could reach out again. To the people [he/she] knows. Alright? But I'm not going to put you in contact with them. They're the only ones that could reach out to me." **Braylovsky** said "The thing is it's just like I said [he/she] told me to be there for 10:15 – 10:30. Alright." The UCE responded "I don't know about that. Okay, as far as I know I was there at 11:00, I waited and found out you already came in and left. I reached back out to [CC1]." **Braylovsky** asked "You have [his/her] number?" and the UCE said "Uh, through my third party. They reached out to [CC1], cause [he/she's] obviously not here. And said you came in early so." Later, the UCE said ". . . so you've got my number. Like I said I'll be in town here." **Braylovsky** asked then UCE how he/she got his number. The UCE gave an explanation. Then, the UCE and **Braylovsky** ended the meeting.[5]

    23. Based on my review of the recording, it did not seem as if **Braylovsky** had changed his mind regarding his plans. Rather, it appeared as though **Braylovsky** was skeptical of the UCE

---

5  The recording device captured an audio recording of the conversation, but you cannot see anything of substance in the video.

and wanted to talk to CC1 directly before moving forward.

24. **Braylovsky's** conversations with the UCE corroborate the information that CC1 and CC2 told investigators. Based on all of the circumstances of this investigation, I believe the information that CC1 and CC2 told investigators is accurate and reliable.

25. As of the time this affidavit is being presented, I am not aware of any additional contact from **Braylovsky** to the UCE. CC1 has not reported any additional contact with **Braylovsky**. I spoke to CC2 this morning. CC2 told me, in substance, that he/she has not had any additional contact with **Braylovsky**

## **CONCLUSION**

26. Based on the information in this affidavit, there is probable cause to believe, and I do believe, that **Braylovsky** committed the Target Offense. Accordingly, I request that the Court issue a warrant for his arrest.

Respectfully submitted,

_____
JONATHAN LAURIA
Special Agent, FBI

Subscribed and sworn before me on the 27th the of August 2021 at 12:44 p.m.

/s/ S. Dave Vatti
_____
HON. S. DAVE VATTI
UNITED STATES MAGISTRATE JUDGE